# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
February 4, 2000 Session

## PATRICK RYAN MAHAN v. TONYA SUE HURST MAHAN

**Appeal from the Chancery Court for Montgomery County**
**No. 97-03-0021     Carol Catalano, Chancellor**

------

**No. M1999-01366-COA-R3-CV - Filed November 15, 2000**

------

In this divorce case, the husband appeals the award of custody of the children to the wife, the admission of certain evidence at trial, and the redistribution of marital property on a post-judgment motion following his bankruptcy.  We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM C. KOCH, JR., joined.

Troy L. Brooks, Clarksville, Tennessee, for the appellant, Patrick Ryan Mahan.

Elizabeth E. Burnett, Gregory D. Smith, Clarksville, Tennessee, for the appellee, Tonya Sue Hurst Mahan.

## OPINION

I.  Background and Procedural History

Patrick Ryan Mahan ("Husband") and Tonya Sue Hurst Mahan ("Wife") married in 1983. They have two children, a daughter, born in 1985, and a son, born in 1987.  Husband was in the Army for the duration of the marriage and as a result, the family moved periodically.  While Husband was stationed at Ft. Campbell, Wife became friendly with Cindy Fernandez.  Apparently Ms. Fernandez was experiencing some personal problems and, at Wife's suggestion, the parties invited Ms. Fernandez and her children to live with them for a while.

Wife discovered a note in Ms. Fernandez's room,  in Husband's handwriting, asking for a "good luck kiss . . . about 3:30 am." She then recalled another incident in which she discovered Husband walking away from Ms. Fernandez's room in the early morning hours, claiming he "thought

he heard the cat." Wife insisted that Ms. Fernandez move out. Shortly thereafter, Wife took the children and went to stay with her parents in Mississippi.

Wife returned to Tennessee for a hearing on temporary custody of the children. She testified that the trial court[1] gave her the option of remaining in the marital home with the children or surrendering temporary custody to Husband. She chose to leave the children with Husband and return to Mississippi, stating that she could not stand being near Husband at that time. She later returned to Tennessee, and the parties attempted a reconciliation. Husband was baptized, and the parties joined a church. The pastor of the church, Mr. Mulberry, testified over Husband's objection, that Husband had asked for his help in reconciling with Wife. The reconciliation was ultimately unsuccessful and the parties separated again.

Wife introduced phone records showing that Husband continued to contact Ms. Fernandez while he was attending training in Alabama, but during their supposed reconciliation. Witnesses testified that Husband had other extramarital relations and that he interfered with Wife's visits with the children.

The court divorced the parties on grounds of Husband's inappropriate marital conduct, awarded custody to Wife, and gave her most of the parties' personal property. Husband was ordered to pay child support and to maintain a life insurance policy for the benefit of the children. Husband was awarded the marital home, which had some equity, and was assigned most of the debts "in lieu of alimony." Wife's attorney drew up the order, stating that the court found that Husband had made "confessions of adultery to his wife" and that Wife was to be the "sole executor" of Husband's life insurance policy as long as he had a child support obligation. That order was signed by the trial court and filed. Husband's attorney did not file an objection to any portions of the proposed order, but instead allowed the order to be entered and sought to correct the order through a post-judgment motion to alter or amend.

In that motion, Husband asserted that "confessions of adultery" should be stricken and that Wife should not be named as the executor of the insurance policy which he was ordered to maintain for the benefit of the children. A few weeks later Husband filed a Chapter 7 bankruptcy petition.[2] One effect of Husband's bankruptcy was to shift most of his assigned debts back to Wife because she was also liable to the lenders on those debts. Wife then filed her own motion to alter or amend, seeking alimony and the marital home to defray the debts for which she had suddenly become responsible.

After hearing both motions, the trial court amended its original order to list Wife as "sole beneficiary in trust" on the insurance policy, and found that Wife was awarded a divorce "based on

---

[1]A different judge presided over the temporary custody hearing.

[2] Statements at the December 1998 hearing on the post-judgment motions indicated that Husband obtained his discharge in bankruptcy in October 1998.

the inappropriate marital conduct of [Husband], not on the ground of adultery." The court refused to award alimony to Wife, but did award her the marital home to partially offset the debt which Husband's bankruptcy had shifted to her. Husband now appeals the awards of custody of the children and the marital home to Wife, as well as the admission of certain evidence at trial.[3]

## II. Standard of Review

We review the findings of fact by the trial court *de novo* upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d). Because the trial judge is in a better position to weigh and evaluate the credibility of the witnesses who testify orally, we give great weight to the trial judge's findings on issues involving credibility of witnesses. *See Gillock v. Board of Prof'l Responsibility*, 656 S.W.2d 365, 367 (Tenn. 1983). Conclusions of law are not afforded the same deference. *See Brock v. Brock*, 941 S.W.2d 896, 898 (Tenn. Ct. App. 1996).

## III. Custody of the Children

Our courts make no more important decisions than those involving the custody of children. When called upon to order a custody arrangement, a court must consider many factors[4] and make

---

[3] After oral arguments in this matter, this court received an affidavit from Wife which this court has not considered in rendering this opinion, because the information was not relevant to the appeal before us.

[4] Tenn. Code Ann. § 36-6-106 (Supp. 1999) states:

In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, such determination shall be made upon the basis of the best interest of the child. The court shall consider all relevant factors including the following where applicable:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(8), of child abuse, as defined in §§ 39-15-401 or 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in §§ 39-15-401 or 39-15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts

(continued...)

a custody determination based on the best interest of the children. *See* Tenn. Code Ann. § 36-6-106 (Supp. 1999).

In child custody cases, the welfare and best interest of the children are the paramount concern, and the determination of the children's best interest must turn on the particular facts of each case. *See Akins v. Akins*, 805 S.W.2d 377, 378 (Tenn. Ct. App. 1990) (citing *Holloway v. Bradley*, 190 Tenn. 565, 570-72, 230 S.W.2d 1003, 1006 (1950)). In *Holloway*, the Court stated:

> The determining facts in these adoption and custody cases are so infinite in their variety that the reported decision in one case is of little aid or assistance in settling the next. The supreme rule to which all others should yield is the welfare and best interest of the child.

*Holloway*, 190 Tenn. at 571, 230 S.W.2d at 1006.

Where, as here, both parents seek custody, this court has held that the child's best interest is to be determined by using an analysis of the comparative fitness of each parent. *See Bah v. Bah*, 668 S.W.2d 663, 665-66 (Tenn. Ct. App. 1983).

> We adopt what we believe is a common sense approach to custody, one which we will call the doctrine of "comparative fitness." The paramount concern in child custody cases is the welfare and best interest of the child. There are literally thousands of things that must be taken into consideration in the lives of young children, and these factors must be reviewed on a comparative approach:
>
> > Fitness for custodial responsibilities is ***largely a comparative matter***. No human being is deemed perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of two or more available custodians is more or less fit than others. (emphasis supplied).

*Id.*, 668 S.W.2d at 666 (citations omitted).

---

[4] (...continued)
connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child.

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Because the determination of where a child's best interest lies is the result of the consideration of a number of factors in the context of a specific factual situation, *see Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997), it is particularly fact-driven. *See Rogero v. Pitt*, 759 S.W.2d 109, 112 (Tenn. 1988). Such decisions often hinge on the trial court's assessment of the demeanor and credibility of the parents and other witnesses. *See Adelsperger*, 970 S.W.2d at 485. Consequently, appellate courts are reluctant to second-guess a trial court's determination regarding custody and visitation. *See Rutherford v. Rutherford*, 971 S.W.2d 955, 956 (Tenn. Ct. App. 1997) (quoting *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996)). Accordingly, this court will decline to disturb the custody decision of the trial court herein unless that decision is based on a material error of law or the evidence preponderates against it. *See Adelsperger*, 970 S.W.2d at 485.

In the case before us, the trial court found that the children's best interests were served by awarding custody to Wife. Wife was the primary caretaker of the children for most of the marriage, and their sole caretaker during Husband's extended work-related absences. Upon learning of Husband's relationship with another woman, Wife took the children and moved to Mississippi to live with her parents. She returned to Tennessee in April 1997 for a hearing regarding temporary custody. She testified that the judge at the 1997 hearing gave her a choice of moving back into the marital home with the children, or leaving them in Husband's custody. Wife testified that she left the children in Tennessee because she felt like she "just couldn't stay around [Husband] at the time." The parties reconciled briefly, and Wife lived in the marital home with the children while Husband was assigned to Ft. Rucker, Alabama. Shortly after his return, the parties separated again and Husband regained custody of the children. Although their testimonies differ markedly, the evidence fully supports the trial court's finding that Husband "continually hindered [Wife's] attempts at visitation." Husband blocked calls from the homes where Wife stayed after the separation. He reneged on the parties' agreement that the children would go to his parents' home for Thanksgiving and to her parents' home for Christmas, instead allowing the children to "choose" to visit their cousins for both holidays. Husband denied Wife's visitation for the weeks prior to the trial, demanding that she take a drug test, although there was no indication that Wife was using drugs and no such condition was placed on visitation by the court.[5] When Husband needed "to give [himself] a break" from the children, he left them with his parents, even though Wife had requested visitation that weekend. Husband's "family care plan" for the children in case of his deployment gave guardianship of the children to his parents, even though their own mother lived in the area.

Husband emphasizes that Wife did not submit a plan of care for the children by May 5, 1997, as ordered by the court. He fails to mention that, prior to that date, Husband and Wife had reconciled. On May 5, 1997, Wife did not need to submit a plan of care because she and Husband were living together and were both caring for the children. By the time of the trial in this matter, Wife had prepared and submitted a plan of care to the court.

---

[5]Wife testified that she offered to take a drug test, but that Husband said the test would have to be "court ordered" and that she would have to be "taken by the sheriff" for the test before she could visit her children. Wife went to her preferred clinic and voluntarily submitted to a drug test. The test showed no illegal drug use.

In spite of the fact he filed bankruptcy after the trial, Husband claims that he is financially more stable, and able to better provide for the children than Wife.  We note that Wife had maintained employment since her return from Mississippi, and that Husband was ordered to pay $1,100 per month in child support.

Husband claims that the parties' daughter,[6] almost thirteen years old at the time of the hearing, preferred to live with her father.  He cites the testimony of a counselor who tried to negotiate visitation between the parties.  Husband ignores the fact that the trial court, immediately after questioning the daughter *in camera,* announced that the girl expressed no preference.

Wife demonstrated that she was a conscientious mother and that the children were well-behaved in her care.  She returned to Tennessee to be near them.  She changed jobs so her work hours would be more regular, in hopes of visiting her children. She repeatedly attempted to visit her children, despite Husband's refusals.  She offered to take a drug test to prove to  Husband that she was drug-free, although she was under no obligation to do so.

We note that testimony indicated that Father was also capable and concerned for the welfare of the children.  The trial court had to judge the credibility of the witnesses and balance the many factors when making the custody decision. Upon reviewing the evidence, we conclude that the evidence does not preponderate against the trial court's finding that custody with Wife is in the children's best interest.

IV.  The Admissibility of Evidence at Trial

We now turn to Husband's argument that certain pieces of evidence, and certain testimony should have been excluded at trial.  "[T]he admissibility of evidence is a matter which rests within the sound discretion of the trial court. This Court will not interfere with the trial court's exercise of its discretion absent clear abuse." *Young v. Young*, 971 S.W.2d 386, 392 (Tenn. Ct. App. 1997) (citations omitted).

A.  The Evidence Not Produced Prior to the Trial

Husband asserts that the trial court erred in admitting certain evidence which, he claims, was requested but not produced prior to the trial.  Husband claims that "where a party fails to provide for requested discovery, and provides no reasonable explanation for such failure, [then] the evidence should be excluded at trial."  Wife responds that a party has no obligation to disclose "rebuttal evidence."

Tenn. R. Civ. P. 26.02(1) is broad in scope, and allows parties "to obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved . . . including the

---

[6]The parties' son was not yet eleven years old at the time of the trial, and thus, under Tenn. Code Ann. § 36-6-106(7), too young for his preference to be a factor in determining custody.

existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter." Tenn. R. Civ. P. 26.02(1).  The purpose of the rule is to allow the discovery of facts which "will enable litigants to prepare for trial free from the element of surprise . . ." *Strickland v. Strickland*, 618 S.W.2d 496, 501 (Tenn. Ct. App. 1981).  The trial court has wide discretion in its actions upon learning of a discovery violation.  *See id.*  The trial court's admission or exclusion of evidence is reviewed for an abuse of its discretion.  *See id.*  Refusal to allow the disputed evidence is one of the court's options, although not its only one.  *See id.*  The court should consider the explanation for the failure to disclose the evidence, the importance of the evidence, the need for time to prepare to meet the evidence, and the possibility of a continuance.  *See id.*  The court may exclude the evidence, allow the evidence, or grant a continuance to the other party.  *See id.*

With regard to Wife's contention that "rebuttal evidence" is not subject to discovery, this court examined that contention in *Pettus v. Hurst*, 882 S.W.2d 783 (Tenn. Ct. App. 1993), and determined that evidence intended to be used for rebuttal was nonetheless subject to discovery.  *See Pettus*, 882 S.W.2d at 786.  In that personal injury case, the defendant did not disclose the name of a private investigator hired to observe and photograph the plaintiff,  relying upon local court rules which did not require a party to disclose the names of impeachment and rebuttal witnesses.  This court noted that trial courts "may adopt local practice rules as long as they do not conflict with other applicable statutes or rules promulgated by the Tennessee Supreme Court."  *Id*.  We then acknowledged that adversaries are not entitled to discover an opponent's witness list in the absence of a local rule or a court order, but held that Tenn. R. Civ. P. 26.02(1) allowed the discovery of the name of the private investigator as a person who "had personal knowledge of facts relevant to the claims or defenses involved in the case," notwithstanding the defendant's intention to call him as a rebuttal witness.  *Id*. at 787.  Thus, evidence properly requested is subject to discovery, even if it is to be used to rebut an opponent's testimony.

We now turn to the disputed evidence in the case before us.  Husband asserts that the trial court erred in allowing the admission of 1) Husband's long distance calling card bill, 2) photographs of Husband's  truck parked next to Ms. Fernandez's car at a theater and at a private home, and 3) taped telephone conversations between the parties.  He claims that the items were not produced when requested in discovery and that his case was harmed by the introduction.  We shall discuss the pieces of evidence separately.

Husband objects to the introduction of one of his telephone bills,[7] which contained his AT&T calling card charges.  That bill, and another, showed that Husband had remained in contact with Ms. Fernandez, even after she had moved from the parties' home.  Specifically, the disputed bill showed that Husband had called Ms. Fernandez's pager seven times in a five day period.  Husband's counsel

---

[7]Two telephone bills were introduced into evidence, an AT&T bill for direct dialed calls and  an AT&T calling card bill.  Husband's counsel was provided with a copy of the bill for direct dialed calls at a deposition shortly before the trial.  The calling card bill is the subject of the dispute.  The disputed bill was mailed to the marital home during the period the parties were reconciled, but while Husband was training in Alabama.  By agreement of the parties, Wife paid the household bills in Husband's absence.  She discovered the calls to Ms. Fernandez while paying the bill.

argued at trial that he had not been provided with the calling card bill, even though that evidence was requested during discovery. Specifically, he claimed that Wife and her counsel had told him in a deposition six days earlier that they had produced all the tangible evidence they had of Husband's extramarital relations.

Wife's counsel responded, and the record shows,[8] that she had told Husband's counsel at the deposition that she had already provided him with the calling card bill. We find that the trial court properly exercised its discretion in admitting the disputed telephone bill. *See Strickland*, 618 S.W.2d at 501.

Husband also objects to the admission of certain photographs which showed his truck parked next to Ms. Fernandez's car in a theater parking lot and later at a private home. Husband's counsel objected to the introduction of the photographs, stating that they had not been produced in discovery. The trial court allowed the photographs to be admitted as exhibits, pointing out that Husband had already admitted that he and the children had been with Ms. Fernandez and her children the night the photographs were taken. The court also noted that the fact that cars are parked together "does not establish an affair." Husband's counsel responded, "I understand they are not evidence of anything," but persisted in his complaint that the photographs had not been provided prior to trial.

The photographs did not exist at the time of the discovery request; testimony indicated that they were taken after the deposition. Because the record before us does not include the discovery requests, we cannot determine that a continuing obligation to produce existed. We have no basis to find that the trial court abused its discretion in admitting them. *See Strickland*, 618 S.W.2d at 501. In any event, we agree with the trial court that because Husband had already admitted the essence of what the photographs portrayed, he was not harmed by their admission.

Husband also objects to the introduction of tape recorded conversations between himself and Wife. After Husband demanded that Wife submit to a drug test, she recorded three telephone conversations on successive days. The tapes were played in open court, but they were not made exhibits, nor were their contents transcribed, but the trial transcript includes a brief description of the contents by Wife's counsel, made without objection or correction to the statements. The first conversation contained Husband's statements that Wife would have to take a drug test, and that a refusal would mean that Wife would be "found guilty." The second conversation contained Wife's request for supervised visitation until the drug test could be given, and Husband's refusal to allow even the suggested supervised visits. The third conversation contained Husband's statement that Wife would be allowed no visits with the children, not even dinner, and that Wife could only contact her children by telephone.

---

[8]The transcript of the deposition shows that Wife's counsel provided the bill for the direct dialed calls at the deposition and told Husband's counsel, "You have already been provided copies of the American Express that was attached to the motion . . . as well as the initial phone bill – the AT&T calling card." We see no indication that Wife's counsel purposely withheld the calling card bill.

The tapes were offered to rebut Husband's earlier testimony, in which Husband had claimed that his desire for Wife to submit to a drug test was a "safety issue" for the children and in which he denied making certain threats regarding Wife's ability to see the children. On appeal, Husband claims that his counsel had requested production of any evidence Wife would use at trial, and that the tapes were not produced. He claims that the trial court erred in allowing the tapes to be played and that the evidence "substantially harmed" his case.[9]

We note that Husband's interrogatories and Wife's answers are not part of the record before us. We, therefore, cannot determine what was requested prior to Wife's deposition. That deposition was made an exhibit at trial, however, and we have examined it for requests for evidence. Husband's counsel made only one request, that being for "[n]otes, letters, cards, any other type of written documentation or something that you found, you know, anything else dealing with the affair with Ms. Fernandez." While counsel's request for "anything else dealing with the affair" is very broad, it simply is not broad enough to include the tapes of conversations regarding Husband's denial of Wife's visitation. On the record before us, we cannot say that the tapes were included in any discovery request; thus, we cannot find that they were improperly withheld, or that the trial court improperly allowed their admission. *See Reed v. Allen*, 522 S.W.2d 339, 342 (Tenn. Ct. App. 1974) (trial record was insufficient to support the appellant's argument that evidence was erroneously admitted). We find no error in the admission of the tapes into evidence.

## B. The Testimony of the Pastor

Husband objects to the admission of the testimony of his pastor, claiming that his conversations with the pastor were privileged and could not be divulged without his consent.

> Privileges are policy-based exceptions to the general rule that a witness must testify whenever he or she can provide relevant information. Most privileges exist to protect confidential communications between individuals whose relationship is found to have such social significance that its protection is more important than the information the privilege keeps from the trier of fact.

Neil P. Cohen, et al., TENNESSEE LAW OF EVIDENCE §501.3 at 261 (3d ed. 1995). Through its enactment of Tenn. Code Ann. § 24-1-206, our legislature has stated very clearly that communications between individuals and their clergy merit protection from disclosure. *See Jackson v. Futrell*, No. M1999-01046-COA-R3-CV, 2000 WL 279900 at *3-4 (Tenn. Ct. App. Mar. 16, 2000) (no Tenn. R. App. P. 11 application filed).

Tenn. Code Ann. § 24-1-206 states, in pertinent part:

---

[9]We must assume that much of the harm was caused by the apparent discrepancy between Husband's earlier testimony and the tapes.

(a)(1) No minister of the gospel . . . shall be allowed or required in giving testimony as a witness in any litigation, to disclose any information communicated to him in a confidential manner, properly entrusted to him in his professional capacity, and necessary to enable him to discharge the functions of his office according to the usual course of his practice or discipline, wherein such person so communicating such information about himself or another is seeking spiritual counsel and advice relative to and growing out of the information so imparted . . .

(b) The prohibition of this section shall not apply to cases where the communicating party, or parties, waives the right so conferred . . .

In the case before us, the pastor of the parties' church testified over Husband's objection. Wife's counsel explained to the witness, apparently with the trial court's approval, that he could not divulge "anything that was said in confidence in your office with Mr. Mahan and Mrs. Mahan." The pastor then testified to several conversations with Husband, including those conversations "before they were members of our church," "before the counseling," and over the telephone.

The portion of the pastor's testimony to which Husband objects concerns Husband's desire to reconcile with Wife, which he argues should have been excluded as a privileged communication. He contends that the statements he made to the minister about wanting to reconcile with Wife, although outside a formal counseling session, were private and should not have been admitted.

While we find persuasive Husband's argument that his communications to the pastor were "information communicated to [the pastor] in a confidential manner, properly entrusted to him in his professional capacity" while Husband was "seeking spiritual counsel and advice relative to and growing out of the information so imparted," Tenn. Code Ann. § 24-1-206(a)(1), we need not determine whether those statements were improperly admitted. We find no reversible error in allowing the pastor's testimony regarding Husband's desire for a reconciliation. Concerning the substantive issues on appeal, custody of the children and the redistribution of property, the fact that one party or the other desired a reconciliation is irrelevant. We are simply unable to see how Husband's desire to reconcile damages him on any issue. Thus, we find the admission of the pastor's testimony regarding Husband's desire to reconcile with Wife to be harmless error, if error at all. *See State v. Boling*, 806 S.W.2d 202, 204 (Tenn. Crim. App. 1990).

V. The Redistribution of the Property

The trial court entered its order divorcing the parties on February 24, 1998. Husband filed a timely motion to alter or amend, pursuant to Tenn. R. Civ. P. 59.04, on March 24, 1998, seeking to change some language in the order. One effect of the motion to alter or amend was that it prevented the order divorcing the parties and distributing the property from becoming final. *See* Tenn. R. App. P. 3(a) ("any order that adjudicates fewer than all the claims . . . is subject to revision at any time before entry of a final judgment"); *Grissim v. Grissim*, 637 S.W.2d 873, 875 (Tenn. Ct. App. 1982) ("if part of a judgment is challenged by a post trial motion . . . then the trial court has not finally adjudicated all of the claims . . . and the judgment is subject to revision . . . before entry of

final judgment"). Husband filed his Chapter 7 bankruptcy petition on May 19, 1998, one effect of which was to shift much of the marital debt assigned to him by the court back to Wife because she was also liable on those joint debts. Wife then filed her own motion to alter or amend on June 3, 1998, alleging that Husband's bankruptcy increased her own debt by more than $27,000, and requesting that the final decree be amended to award her alimony and the marital home. Both requests were based on the need to defray the sudden burden of Husband's previously assigned debts.

The trial court heard arguments on both motions, as well as other petitions not relevant here, on December 22, 1998, and granted Husband's motion to change some language in the original order. The court refused to award Wife alimony, and she does not appeal that decision. Regarding the marital home, the court reminded the parties that it had been awarded to Husband because he had been assigned the marital debt. The court then found that "it would not be equitable for [Husband] to be free from debts and receive all equity from the marital home," and awarded the home, which had approximately $7,000 equity, to Wife.

Husband argues that the trial court abused its discretion by "punishing" him for exercising his right to discharge his debts in bankruptcy by divesting him of the marital home. Wife asserts that because the bankruptcy affected the previous division of property, the court was within its discretion to modify the award.

When making a division of marital property, a court is to consider several factors in order to achieve an "equitable" division. *See* Tenn. Code Ann. § 36-4-121. One purpose of the trial court's decisions regarding marital property is to divide the property accumulated by the efforts of both parties in a fair manner. *See Hausmann v. Hausmann*, No. 01A01-9702-CH-00092, 1997 WL 672649 at *4 (Tenn. Ct. App. Oct. 29, 1997) (no Tenn. R. App. P. 11 application filed). Another purpose is to provide each party with sufficient property to meet that party's future needs. *See id.* The trial court had attempted to be fair to both parties in its original division of property and distribution of debts. Husband's bankruptcy disrupted the division the court had made by shifting the debts onto Wife.

When the trial court revisited the order, it properly reexamined the property division in light of the changed circumstances, and attempted to, again, make an equitable distribution of the property. *See Grissim*, 637 S.W.2d at 875. The $7,000 equity in the home only partially offset the more than $27,000 in debts for which Wife suddenly became liable. We affirm the trial court's award of the marital home to Wife.

## VI. Conclusion

For the reasons stated above, we affirm the awards of custody and marital property to Wife, and find no reversible error in the trial court's admission of disputed evidence. This case is remanded for such further proceedings as may be necessary. Costs are taxed to the appellant, Patrick Ryan Mahan, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE